UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
                                                 :

CANDIDA RAMIREZ LOPEZ,                  :
                                               :

                             Petitioner,      :            25-CV-04826 (JAV)
                                                 :

                 -v-                       :           <u>OPINION AND ORDER</u>
                                                 :

DONALD J. TRUMP, et al.,               :
                                                 :

                             Respondents.    :
------------------------------------------------------------------X

JEANNETTE A. VARGAS, United States District Judge:

      Petitioner Candida Ramirez Lopez, a fifty-three-year-old mother and grandmother, unlawfully entered the United States. Since 2019, she has lived in Staten Island with her family, including her high-school-aged son, pursuant to the terms of an Order of Supervision ("OSUP"). She has no criminal record. For the past six years, she has complied with the terms of her supervised release and attended each of her scheduled check-ins with Immigration Customs and Enforcement ("ICE").

      On June 4, 2025, Petitioner was taken into ICE custody without warning at one of her required check-ins. After being moved across four different states, Petitioner was ultimately detained at an ICE detention facility in Houston, Texas. Petitioner filed a petition for a writ of habeas corpus under 28 U.S.C. § 2241, requesting release from ICE custody. ECF No. 1 ("Habeas Pet."). Petitioner also submitted an application for a temporary restraining order ("TRO") and preliminary injunction pursuant to Rule 65 of the Federal Rules of Civil Procedure, seeking an

order, *inter alia*, (1) releasing Petitioner pending the instant proceedings, or alternatively, requiring that Respondents ("Respondents" or "Government") keep Petitioner in this District pending these proceedings, and (2) restraining Respondents from removing Petitioner from the United States pending these proceedings. ECF No. 8 ("TRO Mot."). The parties appeared for a hearing on the motion for a TRO on June 20, 2025. At the conclusion of the hearing, the Court ordered Petitioner's release from ICE custody, with an opinion to follow, and reserved decision on Petitioner's application for a stay of removal.

The Court issues this opinion to explain its reasons for granting the motion for a TRO requiring Petitioner's release from custody. Additionally, for the reasons that follow, the Court also GRANTS the application for a TRO staying Petitioner's removal.

## BACKGROUND

### I.    Relevant Statutory Framework

#### A. Removal Procedures

The Immigration and Nationality Act ("INA") and its implementing regulations establish the procedures governing the removal of inadmissible aliens from the United States. ICE initiates removal proceedings by serving the alien with a "notice to appear." 8 U.S.C. § 1229(a). That notice informs the alien of, among other things, the charges against him and the time and place of the hearing at which an immigration judge will determine whether the alien is to be removed. *Id.* §§ 1229(a)(1)(D), (G)(i). At that hearing, an immigration judge will determine

2

whether the alien is inadmissible, and therefore subject to removal. *Id.* § 1229a(a)(1). The alien is entitled to seek various forms of relief or protection from removal during those proceedings, such as asylum or withholding of removal. *Id.* § 1229a(c)(4)(A); 8 C.F.R. §§ 1208.4(b)(3)(i), 1240.11(c), (e). "If the immigration judge decides that the alien is inadmissible or deportable and that the alien is not entitled to any of the relief or protection that he requested, the immigration judge will issue an order of removal." *Johnson v. Guzman Chavez*, 594 U.S. 523, 528 (2021) (citing 8 U.S.C. § 1229a(c)(5)). The order of removal issued by the immigration judge can be appealed to the Board of Immigration Appeals ("BIA"), and a petition for review of the BIA's decision can be filed in a Court of Appeals. *See Dep't of Homeland Sec. v. Thuraissigiam*, 591 U.S. 103, 108 (2020). The alien may also file a motion with the immigration judge to reconsider, 8 U.S.C. § 1229a(c)(6), or to reopen their proceedings, *id.* § 1229a(c)(7). *See also* 8 C.F.R. § 1240.15.

A motion to reopen removal proceedings based on new facts and supported by new and previously unavailable evidence can be filed within 90 days of the final removal order. *See* 8 U.S.C. §§ 1229a(c)(7)(A)-(C); 8 C.F.R. § 1003.23(b)(3). A motion to reopen based upon changed country conditions can be made at any time. *Id.* § 1229a(c)(7)(C)(ii). The deadlines for filing a motion to reopen are subject to equitable tolling. *Ali v. Gonzales*, 448 F.3d 515, 517 (2d Cir. 2006).

## B.  *In Absentia* Removal Proceedings

When an alien does not appear at a proceeding before the immigration court in response to a notice to appear, an immigration judge may hold an *in absentia* hearing.  *See* 8 U.S.C. § 1229a(b)(5); 8 C.F.R. § 1003.26.  "[T]he Immigration Judge shall order the alien removed *in absentia* if: (1) [Department of Homeland Security ("DHS")] establishes by clear, unequivocal, and convincing evidence that the alien is removable; and (2) [DHS] establishes by clear, unequivocal, and convincing evidence that written notice of the time and place of proceedings and written notice of the consequences of failure to appear were provided to the alien or the alien's counsel of record."  8 C.F.R. §§ 1003.26(c)(1), (c)(2); *see also* 8 U.S.C. § 1229a(b)(5)(A).  Written notice is not required if the alien failed to provide a current address.  8 U.S.C. § 1229a(b)(5)(B).

"There are three scenarios in which an *in absentia* removal order may be rescinded."  *Campos-Chaves v. Garland*, 602 U.S. 447, 452 (2024).  Under the INA, an *in absentia* order can be rescinded upon a motion with the immigration court within 180 days of the date of the order of removal demonstrating that the failure to appear was because of exceptional circumstances.  8 U.S.C. § 1229a(b)(5)(C)(i).  An order can also be rescinded upon a motion filed at any time if the alien did not receive notice or was in custody.  *Id.* § 1229a(b)(5)(C)(ii).  The filing of a motion to rescind stays the removal of the alien pending disposition by the immigration judge.  *Id.*  Petitions for judicial review of an *in absentia* order are permitted, although they are limited to "(i) the validity of the notice provided to the alien; (ii) the reasons for

4

the alien's not attending the proceeding; and (iii) whether or not the alien is removable." *Id.* § 1229a(b)(5)(D).

### C. Reinstatement of Removal Order

"Congress has created an expedited process for aliens who reenter the United States without authorization after having already been removed," set forth at 8 U.S.C. § 1231(a)(5). *Johnson*, 594 U.S. at 527. Section 1231(a)(5) provides:

> If the Attorney General finds that an alien has reentered the United States illegally after having been removed or having departed voluntarily, under an order of removal, the prior order of removal is reinstated from its original date and is not subject to being reopened or reviewed, the alien is not eligible and may not apply for any relief under this chapter, and the alien shall be removed under the prior order at any time after the reentry.

Reinstatement is a summary proceeding conducted by an ICE official, which involves a determination of whether the alien was subject to a prior order of removal; if the alien was removed or departed voluntarily while under an order of removal, and whether the alien unlawfully reentered the United States. *See* 8 C.F.R. § 241.8. If those three criteria are met, the ICE official can issue a notice of reinstatement. *Id.*

Other than seeking withholding of removal to a particular country, aliens subject to an order of reinstatement cannot seek any other relief. *Delgado v. Mukasey*, 516 F.3d 65, 71 (2d Cir. 2008) ("[O]nce a petitioner's prior removal order has been reinstated, he no longer qualifies for any relief under the INA."). They do not receive a hearing in the immigration court and are prohibited from moving to reopen their prior removal proceedings, from challenging the original order of

removal, or from seeking any other form of discretionary relief. *Johnson*, 594 U.S. at 530-31.

### D.  U Visa

The Victims of Trafficking and Violence Prevention Act of 2000 established a new classification of nonimmigrant visa commonly referred to as a "U Visa."  Pub. L. No. 106–386, § 1513, 114 Stat. 1464 (2000).  This type of nonimmigrant visa was created for aliens who have "suffered substantial physical or mental abuse as a result of having been [victims] of [qualifying] criminal activity," such as, *inter alia*, domestic violence and sexual assault.  8 U.S.C. § 1101(a)(15)(U)(i).  Codified at 8 U.S.C. § 1101(a)(15)(U), the statute allows an alien to petition for status if DHS determines that the alien is a victim of a qualifying crime, that violated the laws of the United States or occurred within the United States, and the alien has been helpful, or is likely to be helpful to law enforcement in the investigation or prosecution of the criminal activity.  *Id.*  The purpose of the U Visa is to "facilitate the reporting of crimes" and "strengthen the ability of law enforcement agencies to detect, investigate, and prosecute cases of domestic violence, sexual assault, trafficking of aliens, and other crimes."  Pub. L. No. 106–386, § 1513(a)(2)(A), (B).

A U Visa provides lawful temporary nonimmigrant status "for a period of not more than 4 years," including authorization to work in the United States.  8 U.S.C. § 1184(p)(6).  A U Visa recipient may apply for an adjustment of status to that of a lawful permanent resident after three years.  *Id.* § 1255(m)(1)(A).  Although aliens who entered the United States without being admitted or paroled ordinarily are

ineligible to receive visas, 8 U.S.C. § 1182(a)(6), Congress provided a mechanism for waiving this prohibition for U Visa applicants.  *Id.* § 1182(d)(14).

## II.    Petitioner First Enters the United States

Petitioner Candida Ramirez Lopez is a Honduran national.  Habeas Pet., ¶ 8. On April 23, 2005, Customs and Border Patrol ("CBP") encountered Petitioner near the Port of Entry in Hidalgo, Texas.  ECF No. 21 ("Alexander Decl."), ¶ 4.  Petitioner did not present valid entry documents and admitted to entering unlawfully.  *Id.* Consequently, CBP served her with a Notice to Appear charging her with removability pursuant to Section 212(a)(6)(A)(i) of the INA.  *Id.*, ¶ 5.  She was released from custody the same day.  *Id.*, ¶ 6.

On October 21, 2005, an Immigration Judge in Harlingen, Texas issued an *in absentia* order of removal after Petitioner failed to appear for her initial master calendar hearing.  *Id.* ¶ 7.  The Immigration Court was unable to forward Petitioner the removal order because she did not provide an address after she was released from CBP custody.  *Id.*

## III.    Petitioner Reenters the United States

On March 9, 2019, CBP picked up Petitioner and her then eleven-year-old son[1] in the Rio Grande Valley near Roma, Texas.  Alexander Decl., ¶ 8.  A few days later, on March 14, 2019, Petitioner was served with a Notice of Intent/Decision to Reinstate Prior Order ("Reinstatement Notice").  *Id.* ¶ 10.  The Reinstatement

---

[1] Petitioner's son is a recent high school graduate.  He was granted Special Immigrant Juvenile Status ("SIJS") in December 2023 due to his father's abandonment.  Habeas Pet., ¶ 40.

Notice states that Petitioner "departed voluntarily, on September 15, 2005, pursuant to an order of [removal] on or after the date on which such order took effect (i.e., who self-deported)."  ECF No. 24 ("Wilkins Reply Decl."), Ex. C.  The Reinstatement Notice is facially erroneous, as it states that Petitioner voluntarily departed the country in September 2005 pursuant to a final order of removal, yet the *in absentia* order of removal was not entered until October 2005.  *Id.*[2]

The next day, Petitioner and her son were transferred to ICE custody and were detained at the South Texas Family Residential Center in Dilley, Texas.  Alexander Decl., ¶ 11.  Petitioner and her son were released by ICE on March 22, 2019, pursuant to an OSUP.  ECF. No. 12 ("Wilkins Decl."), Ex. E; *see also* ECF No. 28, Transcript of June 20, 2025 TRO Hearing ("Hr'g Tr.") at 15:1-6.  Her release conditions included a requirement that Petitioner report to a local ICE office at her destination in Memphis, Tennessee.  Alexander Decl., ¶ 12.  On October 1, 2019, Petitioner provided ICE her new address in Staten Island, New York, which led ICE to transfer her case to the ICE office in New York.  *Id.* ¶ 13.

---

[2] Whether Petitioner was still present in the United States on the date the *in absentia* order was issued is in dispute.  The Government contends that Petitioner provided a sworn statement to CBP stating that she left the United States and returned to Honduras on September 15, 2005.  Alexander Decl., ¶ 9.  Petitioner's attorneys dispute this and state that Petitioner left the United States in 2006, after the order of removal was issued.  Wilkins Reply Decl., ¶ 14**.**

## IV.    Petitioner's Applications

In May 2021, Ramirez Lopez was the victim of an attempted rape and abusive sexual contact.  Habeas Pet., ¶ 41.  As a result of this incident and the Petitioner's cooperation with law enforcement, she became eligible and applied for a U Visa.  *Id.*  As of February 14, 2025, her application remains pending.  Habeas Pet., ¶ 42.  On April 29, 2025, the United States Citizenship and Immigration Services ("USCIS") issued the receipt of notice for her pending U Visa application.  Wilkins Decl., ¶ 12.

Petitioner has been consistent with her ICE check-ins since her release from custody in 2019.  Habeas Pet., ¶ 46.  On February 27, 2025, Petitioner submitted a request for a Reasonable Fear Interview ("RFI") to ICE and the USCIS New York Asylum Office.  Wilkins Decl., ¶ 5.  On March 6, 2025, she proceeded to her scheduled check-in with ICE, at which time her attorney presented the original signed copy of her RFI request and informed the deportation officer on duty about her pending U Visa application.  *Id.* ¶¶ 7-8.  Ramirez Lopez was then scheduled to return for another check-in on June 17, 2025.  *Id.* ¶ 9.  Around seven weeks later, on April 23, 2025, she received a response from USCIS stating that they were not currently scheduling Credible/Reasonable Fear Interviews for people who were not detained, essentially denying her request for an interview.  *Id.* ¶ 11.

## V.    Recent Detention

On June 2, 2025, Petitioner received an automated message to report to an Intensive Supervision Program ("ISAP") office in New York on June 3 or 4.  Wilkins

Decl., ¶ 14.  Petitioner, accompanied by her attorney, presented herself at the ISAP office on June 4, 2025.  *Id.* ¶ 15.  She was separated from her counsel, and then taken into custody by ICE.  *Id.* ¶¶ 15-22.  Her arrest was pursuant to a Warrant of Removal issued pursuant to the Reinstatement Notice.  Alexander Decl., ¶ 15. There is no indication in the record that Petitioner was served with a notice that her OSUP had been revoked at that time, or any other time.

Despite having made the decision to take her into custody, ICE had not made any arrangements to house Petitioner.  *Id.* ¶¶ 16-19.  ICE therefore had to make requests to various facilities to find bed space for her.  *Id.*  On June 5, 2025, Petitioner was temporarily transferred from 26 Federal Plaza, New York, New York to the Elizabeth Detention Center in Elizabeth, New Jersey, while awaiting bed space approval.  *Id.* ¶ 18.  As the New Jersey facility was over capacity, Ramirez Lopez was then transferred back to 26 Federal Plaza on the morning of June 6, 2025.  *Id.*

In the meantime, Petitioner's counsel was desperately trying to find out where she was.  Wilkins Decl., ¶¶ 21-33.  ICE officials told her counsel to check the ICE detainee locator, but for days it showed no information on Petitioner.  *Id.* ¶¶ 22-27.  Repeated attempts to find out from ICE officials where Petitioner had been taken, including calls to ICE detention facilities across the country, proved futile. *Id.* ¶¶ 21-33.  Ramirez Lopez's counsel finally filed the instant Petition for Writ of Habeas Corpus in the Southern District of New York on June 7, 2025.  *Id.* ¶ 35.

In the afternoon of June 6, Petitioner's legal team also attempted to submit an Application for a Stay of Removal or Deportation (the "Application") (ICE Form I-246) at the ICE Field Office in 26 Federal Plaza.  ECF No. 11 ("Norton Decl."), ¶ 3. According to the instructions on that form, stay applications must be submitted to the local ICE Enforcement and Removal Operations Field Office that has jurisdiction over the detainee's custody.  *Id.* ¶ 4.  An ICE employee returned the Application to one of Petitioner's attorneys, stating that he could not accept it because Petitioner was "in transit."  *Id.* ¶ 7.  Yet at that time, Petitioner was physically in custody at the 26 Federal Plaza facility.  Alexander Decl., ¶¶ 18-21.

Two days later, on June 8, 2025, Petitioner was transported by ICE to the Houston Detention Facility in Houston, Texas.  *Id.* ¶ 21.  The next day on June 9, 2025, one of the Petitioner's attorneys received a communication from an ICE officer, who confirmed that he had transmitted the request for an RFI.  Wilkins Decl., ¶¶ 43-44.  As of June 10, 2025, that interview had yet to be scheduled.  *Id.*

On June 16, 2025, ICE realized that the Reinstatement Notice it had issued in March 2019 was invalid and rescinded it as improvidently issued.  Alexander Decl., ¶ 22; *see also* Wilkins Reply Decl., Ex. C.  On that same day ICE served Ramirez Lopez with a new Warrant of Removal, seeking instead to remove Petitioner under the authority of the original removal order ("Warrant of Removal"). *Id.* ¶ 23; *see also* Wilkins Reply Decl., Ex. E.  The Warrant of Removal states that Petitioner was subject to removal pursuant to Section 212(a)(6)(A)(i) of the INA. Wilkins Reply Decl., Ex. E.

## VI.    TRO Hearing

On June 20, 2025, the Court held a hearing with respect to Petitioner's motion for a TRO.  At that hearing, Respondents admitted that they had no evidence that ICE had revoked Petitioner's OSUP in accordance with the governing regulation.  Hr'g Tr. at 15:2-25.  Respondents also conceded that the basis on which Petitioner had been taken into custody had shifted.  Respondents had, in their papers with the Court, initially stated that Petitioner was being removed in accordance with the Reinstatement Notice.  ECF No. 20.  The Reinstatement Notice had since been rescinded, however, and ICE was now removing Petitioner pursuant to the October 2005 final order of removal.  Hr'g Tr. at 20:3-15, 23:5-10. Respondents agreed that Petitioner would now have available to her procedural remedies, including the option to move to reopen the *in absentia* removal order, that she could not have pursued if she were subject to a reinstatement of removal.  Hr'g Tr. at 20:3-25.

At the conclusion of the hearing, the Court ordered the Government to transfer Petitioner back to the Southern District of New York and release Petitioner under the same conditions of her prior OSUP.  ECF No. 26 ("Release Order").  The Court stated that an opinion would follow with respect to its decision on Petitioner's detention claim.  Hr'g Tr. at 26:14-21.  The Court reserved decision with respect to Petitioner's motion for a stay of removal.  *Id.*  The Court temporarily stayed

Petitioner's removal as it considered Petitioner's motion for a TRO, however, for the purpose of retaining its jurisdiction.[3]

## DISCUSSION

The Court finds that Petitioner has met her burden of establishing a likelihood of success on the merits, that she is likely to suffer irreparable harm in the absence of injunctive relief, that the balance of equities tip in her favor, and that an injunction is in the public interest. The Court separately addresses Petitioner's motion for release from immigration detention and her application for a stay of removal.

## I.    Petitioner's Detention Claim

Petitioner contends that the revocation of her OSUP and the manner of her detention violated both her right to due process and governing ICE regulations. ECF No. 9 ("TRO Mem."). The motion for a TRO seeks her release pending adjudication of her habeas petition. Pursuant to 28 U.S.C. § 2241(c)(3), this Court may issue a writ of habeas corpus with respect to a person detained in violation of the Constitution or laws of the United States. "Individuals may rely on this provision to seek release from post-removal-period detention and supervision." *Doe v. Barr*, 479 F. Supp. 3d 20, 26 (S.D.N.Y. 2020) (cleaned up). To obtain a TRO ordering her release from immigration custody, Petitioner must show (1) likelihood

---

[3] *Garcia-Izquierdo v. Gartner*, No. 04-CV-7377 (RCC), 2004 WL 2093515, at *2 (S.D.N.Y. Sept. 17, 2004) (observing that, under the All Writs Act, 28 U.S.C. § 1651, a district court "may order that a petitioner's deportation be stayed . . . when a stay is necessary to preserve the Court's jurisdiction of the case").

of success on the merits on her habeas claim; (2) likelihood of irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in his favor; and (4) that an injunction is in the public interest.  *See Basank v. Decker*, 449 F. Supp. 3d 205, 210 (S.D.N.Y. 2020).  "Like a preliminary injunction, a temporary restraining order is 'an extraordinary remedy never awarded as of right.'"  *Bragg v. Jordan*, 669 F. Supp. 3d 257, 267 (S.D.N.Y. 2023).  The Court determined at the June 20 hearing that Petitioner had made the requisite showing for a TRO and ordered Petitioner's release from detention.  This opinion sets forth the reasons for the Release Order.

### A.  Petitioner Has Established a Likelihood of Success on the Merits

In opposing the motion for a TRO, the Government raises two primary arguments.  First, the Government contends that the Court lacks jurisdiction to grant the TRO.  ECF No. 22 ("Opp. Br.") at 8-13.  Second, the Government argues that Petitioner cannot establish that her detention violates her right to due process.  *Id.* at 13-16.  Both of these arguments lack merit.

#### 1.  The Court Has Jurisdiction Over the Claims Related to the Lawfulness of Petitioner's Detention

As a preliminary matter, the Court has jurisdiction over the habeas petition to the extent it seeks Petitioner's release from ICE detention.  Respondents argue that 8 U.S.C. § 1252(g) "eliminates subject matter jurisdiction over habeas challenges, including constitutional claims, to an arrest or detention for the purpose of executing a final removal order."  Opp. Br. at 10.  Respondents overstate the jurisdictional bar imposed by Section 1252(g).

14

Section 1252(g) provides that "no court shall have jurisdiction to hear any cause or claim by or on behalf of any alien arising from the decision or action by the Attorney General to commence proceedings, adjudicate cases, or execute removal orders against any alien."  8 U.S.C. § 1252(g).  As the Supreme Court has made clear, Section 1252(g) is not a "'zipper' clause that says 'no judicial review in deportation cases unless this section provides judicial review.'"  *Reno v. Am.-Arab Anti-Discrimination Comm. ("AAADC")*, 525 U.S. 471, 482 (1999).  "Section 1252(g) is directed 'against a particular evil: attempts to impose judicial constraints upon prosecutorial discretion.'"  *Ozturk v. Hyde*, 136 F.4th 382, 396 (2d Cir. 2025) (quoting *AAADC*, 525 U.S. at 485 n.9).  Accordingly, it is a "narrow" provision that is limited to three discrete actions:  the "decision or action" to "*commence* proceedings, *adjudicate* cases, or *execute* removal orders."  *AAADC*, 525 U.S. at 482 (emphasis added) (quotation marks omitted).

Applying *AAADC,* the Second Circuit has held that Section 1252(g) does not strip district courts of jurisdiction to consider habeas challenges to a noncitizen's continued detention by immigration authorities.  *See, e.g.*, *Ozturk*, 136 F.4th at 397 ("Section 1252(g) does not preclude jurisdiction over the challenges to the legality of [an alien's] detention." (quotation marks omitted)); *see also Prado v. Perez*, 451 F. Supp. 3d 306, 312 (S.D.N.Y. 2020) ("[C]ourts in this district have found that there is no deprivation of jurisdiction to hear claims arising from unlawful arrest or detention, because those claims are too distinct to be said to 'arise from' the commencement of removal proceedings."); *Michalski v. Decker*, 279 F. Supp. 3d 487,

495 (S.D.N.Y. 2018) ("[B]ecause Michalski's petition only challenges the extent of the Attorney General's authority to detain him as opposed to the Attorney General's exercise of discretion for the three enumerated types of decisions or actions, § 1252(g) is inapplicable."); *cf. Zadvydas v. Davis*, 533 U.S. 678, 688 (2001) ("We conclude that § 2241 habeas corpus proceedings remain available as a forum for statutory and constitutional challenges to post-removal-period detention.").

As in those cases, Petitioner's detention claim does not challenge ICE's exercise of prosecutorial discretion.  ECF No. 25 ("Reply Br.") at 3 ("[Petitioner] is challenging the constitutionality of her detention, seeking a stay of removal pending the adjudication of this case, and seeking to be released from custody. She does not seek to collaterally attack her removal order.").  Instead, Petitioner contests the lawfulness of her continued detention by ICE.  The Court therefore has jurisdiction over this aspect of Petitioner's habeas petition.

### 2. Petitioner Has Established That She is Likely to Succeed on the Merits of Her Detention Claim

Petitioner argues that her abrupt detention by ICE, without any notice or an opportunity to be heard and in violation of ICE regulations, violated her right to due process.  TRO Mem. at 3.  The Court agrees that Petitioner is likely to succeed on this claim.

The Due Process Clause provides that "[n]o person shall ... be deprived of life, liberty, or property, without due process of law."  U.S. Const. Amend. V.  "The Due Process Clause has been interpreted as a 'protection of the individual against arbitrary action of government,' which has both a procedural component protecting

Case 1:25-cv-04826-JAV    Document 31    Filed 07/10/25    Page 17 of 35


against the 'denial of fundamental procedural fairness,' as well as a substantive component guarding the individual against 'the exercise of power without any reasonable justification in the service of a legitimate governmental objective.'" *Calderon v. Sessions*, 330 F. Supp. 3d 944, 958 (S.D.N.Y. 2018) (citations omitted). It is well established that the "due process right under the Fifth Amendment extends to aliens in removal proceedings." *Id.* (citing *Reno v. Flores,* 507 U.S. 292, 306 (1993)).

Petitioner was released from ICE custody in 2019 pursuant to an OSUP. Petitioner could not be taken back into ICE custody unless ICE complied with its own regulations governing the revocation of an OSUP. At the TRO Hearing, counsel for the Government was unable to point to any evidence that ICE had complied with its revocation procedures in this case. Accordingly, Petitioner is likely to succeed on her claim that her detention violated her right to due process.

Both parties agree that 8 C.F.R. § 241.4(l) controls. *See* Hr'g Tr. at 12:20-23; 15:19-22. This regulation sets forth the procedures ICE must follow in order to revoke an OSUP and return the alien to custody. Section 241.4(l)(1) provides that an individual "who has been released under an order of supervision or other conditions of release who violates the conditions of release may be returned to custody." The alien must be "notified of the reasons for revocation of [] her release" and "afforded an initial informal interview promptly after [] her return to Service custody to afford the alien an opportunity to respond to the reasons for revocation stated in the notification." *Id.* Alternatively, the Executive Associate

Commissioner has discretionary authority "to revoke release and return to Service custody an alien previously approved for release under the procedures in this Section." *Id.* § 241.4(l)(2). And a district director may also revoke release of an alien when, "in the district director's opinion, revocation is in the public interest and circumstances do not reasonably permit referral of the case to the Executive Associate Commissioner." *Id.* To exercise its discretion, the revoking official must find that "(i) the purposes of release have been served; (ii) the alien [has] violate[d] any condition of release; (iii) it is appropriate to enforce a removal order or to commence removal proceedings against an alien; or (iv) the conduct of the alien, or any other circumstance, indicates that release would no longer be appropriate." *Id.*

At the TRO Hearing, Respondents could not even confirm whether or not ICE had actually revoked Petitioner's OSUP, let alone what authority ICE had relied upon, who the revoking official was, and whether that official had adhered to ICE's regulations in doing so. *See* Hr'g Tr. at 15:2-7 ("I was able to confirm just this morning that there apparently was an order of supervision back in 2019 . . . I have no information from ICE as to whether that was revoked or not."); Hr'g Tr. at 15:23-25 ("THE COURT: But you don't know, standing here today whether ICE actually followed those [8 C.F.R. § 241.4(1)] protocols? [RESPONDENTS]: I do not, your honor."). Absent such evidence, Petitioner's detention is patently unlawful.

While the Government has the authority to detain individuals in order to effectuate their removal, this "does not mean that it may do so in any manner it chooses, without affording due process." *Ceesay v. Kurzdorfer*, No. 25-CV-267-LJV,

18

2025 WL 1284720, at *13 (W.D.N.Y. May 2, 2025).  "[C]ourts have repeatedly
recognized the importance of process, particularly where, as here, a person's
freedom stands in the balance."  *Id.*  Requiring the Government to adhere to duly
promulgated regulations that protect individuals against the arbitrary deprivation
of their liberty is essential to maintaining the rule of law.  The Court therefore has
no problem concluding that a revocation of supervision that does not accord with
ICE's own governing regulations constitutes a violation of due process.  *Id.* at *13-
*14; *see also You, Xiu Qing v. Nielsen*, 321 F. Supp. 3d 451, 463 (S.D.N.Y. 2018);
*Rombot v. Souza*, 296 F. Supp. 3d 383, 388 (D. Mass. 2017) ("Based on ICE's
violations of its own regulations, the Court concludes [petitioner's] detention was
unlawful."); *cf. Morton v. Ruiz*, 415 U.S. 199, 235 (1974) ("Where the rights of
individuals are affected, it is incumbent upon agencies to follow their own
procedures.").

The Government argues that Petitioner's detention is authorized by 8 U.S.C.
§ 1231.  Opp. Br. at 13-15.  That statute authorizes the Government to detain an
alien for a 90-day period of time following the issuance of a final removal order for
the purpose of effectuating the alien's removal.  8 U.S.C. § 1231(a)(1)(A).  Aliens
who are ordered removed because they are inadmissible under 8 U.S.C. Section
1182, such as Petitioner, "may be detained beyond the [90-day] removal period," 8
U.S.C. § 1231(a)(6), although the Constitution limits the length of time of such post-
removal detention, *Zadvydas*, 533 U.S. at 679.  The Government contends that the
brevity of Petitioner's detention, which was less than the 90-day statutory removal

period, means that her detention could not implicate the due process concerns raised by *Zadvydas*. Opp. Br. at 13-15. Yet Petitioner is not raising a due process argument regarding the length of her detention. While ICE had the statutory authority to detain Petitioner under Section 1231(a)(6) when she reentered the United States in 2019, it elected not to do so. Instead, Petitioner was released under an OSUP in accordance with Section 1231(a)(3). Once ICE released Petitioner on supervision, it was required to adhere to its own regulations before it could revoke Petitioner's freedom and take her back into custody.

On this record, the Court finds that Petitioner has established a likelihood of success on her claim that her detention by ICE was not in conformance with the governing regulations, and thus violated her right to due process. *See Sameena Inc. v. U.S. Air Force,* 147 F.3d 1148, 1153 (9th Cir. 1998) ("An agency's failure to follow its own regulations . . . may result in a violation of an individual's constitutional right to due process.").[4]

### B. Petitioner Would Suffer Irreparable Harm Absent Injunctive Relief

The Court concludes that Petitioner would suffer irreparable harm in the absence of relief from this Court. "The deprivation of an alien's liberty is, in and of itself, irreparable harm." *Sajous v. Decker*, No. 18-CV-2447 (AJN), 2018 WL

---

[4] It also appears that Petitioner was taken into custody based upon an invalid warrant, another potential due process concern with Petitioner's arrest and detention. The warrant of removal initially issued by ICE was based upon the invalid Reinstatement Notice. But because the parties were not aware of the rescindment of the Reinstatement Notice at the time the motion for a TRO was briefed, the Court does not have the benefit of a full record on this point.

2357266, at \*12 (S.D.N.Y. May 23, 2018) (cleaned up) (quoting *Peralta-Veras v. Ashcroft*, No. CV 02-1840 (IRR), 2002 WL 1267998, at \*6 (E.D.N.Y. Mar. 29, 2002)); *see also Hardy v. Fischer*, 701 F. Supp. 2d 614, 619 (S.D.N.Y. 2010) ("Ongoing unlawful deprivations of liberty and the threat of unlawful detention and reimprisonment would violate plaintiffs' constitutional rights and therefore constitute quintessential irreparable harm."). Petitioner was abruptly and cruelly separated from her family, including her high-school aged child, placed into custody, and then transported around the country for several days, until she landed in a detention facility in Houston, far from her family or her attorneys. Each day that she remained unlawfully in custody constituted an on-going, irreparable harm.

Moreover, the Second Circuit has repeatedly held that "violations of constitutional rights are presumed irreparable." *Connecticut Dep't of Env't Prot. v. O.S.H.A.*, 356 F.3d 226, 231 (2d Cir. 2004) (citation omitted). The violation of Petitioner's due process rights is therefore an independent basis upon which to find that Petitioner has met her burden of establishing irreparable harm.

### C. The Public Interest and Balance of Equities Weigh in Favor of Granting the TRO

Where the Government is the opposing party, the final two factors in the TRO analysis—the balance of the equities and the public interest—merge. *Planned Parenthood of New York City, Inc. v. U.S. Dep't of Health & Human Servs.*, 337 F. Supp. 3d 308, 343 (S.D.N.Y. 2018). The balance of equities and the public interest clearly weigh in favor of granting the TRO.

The "public interest is best served by ensuring the constitutional rights of persons within the United States are upheld." *Coronel v. Decker*, 449 F. Supp. 3d 274, 287 (S.D.N.Y. 2020) (quoting *Sajous v. Decker*, No. 18-cv-2447 (AJN), 2018 WL 2357266, at *13 (S.D.N.Y. May 23, 2018)).  Respondents' abrupt revocation of Petitioner's OSUP and swift detention of Petitioner likely violated federal law and her right to due process.  "There is generally no public interest in the perpetuation of unlawful agency action" and "there is a substantial public interest in having governmental agencies abide by the federal laws that govern their existence and operations." *League of Women Voters of United States v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016) (cleaned up).

Respondents offered no evidence that Petitioner poses a flight risk or danger to the community.  Petitioner has complied with her ICE check-ins, does not have a criminal record, and resides with her son, a recent high school graduate with SIJS status.  As such, any marginal public interest in Petitioner's detention incident to her removal is far outweighed by the public interest in ensuring that constitutional rights of persons within the United States are upheld.

## II.    Stay of Removal

Petitioner separately seeks an order staying her removal pending the adjudication of her habeas petition.  Challenges to removal may be brought in a habeas action when the alien has been detained incident to removal.  *See Trump v. J. G. G.*, 145 S. Ct. 1003, 1005 (2025) ("Regardless of whether the detainees formally request release from confinement, because their claims for relief

necessarily imply the invalidity of their confinement and removal under the Alien Enemy Act, their claims fall within the "core" of the writ of habeas corpus and thus must be brought in habeas." (cleaned up)).

In determining whether a TRO should issue staying removal pending judicial review of the merits of an alien's claim, courts consider "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Nken v. Holder*, 556 U.S. 418, 426 (2009). The third and fourth factors "merge" in the stay of removal context. *Id.* at 435. The Court finds that Petitioner has satisfied the requirements for a TRO granting her a stay of removal.

### A. Likelihood of Success on the Merits

Petitioner is likely to succeed in establishing that the manner in which ICE is seeking to remove Petitioner from the United States violates her rights to due process and the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et seq*. ICE has, for the past six years, essentially denied Petitioner the right to seek relief that Congress, in its considered judgment, has made available to those in Petitioner's situation. As ICE's error deprived Petitioner of the opportunity to challenge her removal order, as she was otherwise legally entitled to do, ICE cannot now remove Ramirez Lopez without first allowing her to pursue her potential legal remedies.

### 1. This Court Has Jurisdiction Over Petitioner's Claim that Her Removal Violates Her Due Process Rights

As with the detention claim discussed above, Section 1252(g) does not strip this Court of jurisdiction to grant a stay of removal. "What matters most for the purposes of the § 1252(g) analysis in this case is determining exactly what decision or action" is being challenged. *D'Ambrosio v. Scott*, 25-CV-468, 2025 WL 1504312, at *5 (D. Vt. May 9, 2025). The substance of the relief Petitioner seeks in this case is not the invalidation of the extant order of removal. Nor is Petitioner challenging the "discrete" decision to execute her removal order in this habeas proceeding. *AAADC*, 525 U.S. at 482. The reasons for ICE's discretionary decision to execute her order of removal are irrelevant to this habeas challenge. Rather, what is at issue is the lawfulness of ICE, through its own administrative error, foreclosing Petitioner from seeking any viable form of relief for years, and then removing her from the United States before she has the opportunity to avail herself of statutorily-provided processes. Nothing in Section 1252(g) precludes this Court from exercising jurisdiction over such a claim.

A number of courts have concluded that Section 1252(g) does not deprive district courts of jurisdiction over habeas petitions seeking stays of removal where the challenge is to the legality of the manner in which ICE executes the removal order. In *You*, for example, the habeas petitioner argued that the Government had violated the APA and his right to due process because ICE attempted to remove him while he was in the midst of pursuing an application for adjustment of status. 321 F. Supp. 3d at 468-69. The court noted that "the question before the Court is not why the Secretary chose to execute the removal order. Rather, the question is

whether the way Respondents acted accords with the Constitution and the laws of this country.  Whether Respondents' actions were legal is not a question of discretion, and, therefore, falls outside the ambit of § 1252(g)."  *Id.* at 457.  "That courts can review 'how' Respondents exercise their discretion [to remove an alien] is, therefore, an uncontroversial proposition."  *Id.*

Similarly, in *Calderon*, the court determined that Section 1252(g) did not preclude a district court from staying the petitioner's removal while he pursued a provisional unlawful presence waiver.  330 F. Supp. 3d at 954.  The court reasoned that because the petitioner did "not challenge ICE's prosecutorial discretion" but "ICE's *legal authority* to exercise such discretion when the subject of the removal order also has a right to seek relief made available by the DHS," Section 1252(g) was inapplicable.  *Id.* (emphasis added).  Other courts have reached a similar conclusion, *see, e.g.*, *M'Bagoyi v. Barr*, 423 F. Supp. 3d 99, 105 (M.D. Pa. 2019); *Lin v. Nielsen*, 377 F. Supp. 3d 556, 563 (D. Md. 2019); *De Jesus Martinez v. Nielsen*, 341 F. Supp. 3d 400, 407 (D.N.J. 2018), although there has been a split of authority on this issue, *see, e.g.*, *Tazu v. Att'y Gen. United States*, 975 F.3d 292, 297 (3d Cir. 2020) (holding that, as a result of Section 1252(g), alien could not challenge timing of removal decision in a habeas petition); *Mamadjonova v. Barr*, No. 9-CV-01317 (VLB), 2019 WL 6174678, at *5 (D. Conn. Nov. 20, 2019) ("[T]heir claims amount to an indirect attack on the order of removal, over which the Court lacks jurisdiction.").

The Court concludes that the reasoning in *Calderon*, *You* and similar cases applies with equal force here.  The instant habeas petition presents "neither a direct nor indirect challenge to [Petitioner's] removal order."  *Calderon*, 330 F. Supp. 3d at 956.  It is a challenge to ICE's *ultra vires* actions.  Indeed, if Petitioner had not brought this habeas petition, ICE would have removed Petitioner from the United States under the purported authority of a legally flawed reinstatement notice. *Tazu*, 975 F.3d at 298 (a challenge to DHS's "lack of statutory authority" is not barred under Section 1252(g) as a "challenge to the exercise of discretion").

If Petitioner is denied the relief she seeks from the immigration courts, ICE will still be able to execute her removal order.  And this matter does not fall within the realm of "prosecutorial discretion."  ICE did not have discretion to shift the grounds upon which Petitioner's removal was based.  Accordingly, under the facts of this case, Section 1252(g) does not preclude the Court's exercise of jurisdiction.

### 2. Petitioner Has Established that She is Likely to Succeed on Her Due Process Challenge to the Execution of her Removal Order

For more than five years, Ramirez Lopez's liberty was restricted under an invalid Reinstatement Notice.  ICE then attempted to effectuate Petitioner's removal under Section 1231(a), although it now concedes that statute was inapplicable.  Hr'g Tr. at 20:8-15.  It was only after the instant habeas petition was filed that ICE realized its error.  *Id.*  ICE no longer seeks to proceed under Section 1231(a), and instead seeks to remove Petitioner pursuant to the 2005 order of

removal. *Id.* The long-lasting consequence of ICE's error, however, cannot be so easily ignored.

When a legislative or regulatory regime creates a process for obtaining relief, a "right to seek relief" is created, even when there is "no right to the relief itself." *Arevalo v. Ashcroft*, 344 F.3d 1, 15 (1st Cir. 2003) (citing *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 268 (1954)). Numerous courts have concluded that the execution of an outstanding removal order while an alien is in the process of exercising a right to seek statutory or regulatory relief under the immigration laws, including discretionary relief, violates the Fifth Amendment and the APA. *See, e.g.*, *D'Ambrosio*, 2025 WL 1594312, at *6 (staying removal while alien had pending petition for adjustment of status under the Violence Against Women Act); *Joshua M. v. Barr*, 439 F. Supp. 3d 632, 682 (E.D. Va. 2020) (staying removal to permit alien to pursue reopening of his removal proceedings to demonstrate his eligibility for asylum and withholding of removal); *Siahaan v. Madrigal*, Civ. No. PWG-20-02618, 2020 WL 5893638, at *1 (D. Md. Oct. 5, 2020) (staying removal to permit alien to pursue reopening of his removal proceedings); *You,* 321 F. Supp. 3d at 469 (granting stay of removal to permit adjudication of application for adjustment of status).

The Court does not need to reach the question of whether a pending application for immigration status or relief renders ICE's execution of a removal order arbitrary, capricious, or contrary to law within the meaning of the APA, 5 U.S.C. § 706(2)(A), or a violation of due process. At a minimum, where an agency's

own conceded error resulted in Petitioner being denied access to avenues of relief for an extended period of time, stripping her of the "right to try," *Calderon*, 330 F. Supp. 3d at 958, that violates due process and the APA.  And in this case, Petitioner was effectively denied the right to seek any of the remedies that the INA and DHS regulations afford an alien in Petitioner's circumstances because of ICE's invalid reinstatement of her prior order of removal.  This prolonged deprivation of Petitioner's right to pursue relief constitutes a textbook example of a due process violation.

As a noncitizen subject to an *in absentia* removal order, Petitioner was entitled to seek both rescission under 8 U.S.C. § 1229a(b)(5)(C) and reopening under 8 U.S.C. § 1229a(c)(7).  In contrast, aliens whose prior order of removal has been reinstated are entitled to none of those protections.  8 U.S.C. § 1231(a)(5); *Johnson*, 594 U.S. at 530.  "The motion to reopen is an important safeguard intended to ensure a proper and lawful disposition of immigration proceedings." *Kucana v. Holder*, 558 U.S. 233, 242 (2010) (cleaned up).  Petitioner had raised to DHS a claim that she has a reasonable fear of returning to Honduras through the only mechanism available to a noncitizen under an order of reinstatement, a request for an RFI.  In contrast, had she been allowed to bring a motion to rescind or reopen and been granted such relief, she could have sought discretionary relief from the immigration court, including asylum or withholding of removal, as well as a stay of removal.  If that motion had been denied, she would have been able to take an appeal to the BIA, and ultimately seek review in the Court of Appeals.

These errors are compounded by the fact that ICE refused to accept Petitioner's request for a stay of removal on the grounds that she was "in transit" when she was not. ICE then declined to bring Petitioner in for an RFI on the grounds that she was not "detained." At each point at which Petitioner attempted to invoke rights granted to her by the existing regulatory scheme, she was unjustifiably denied the opportunity to do so by ICE.

As a court in this District concluded in granting a stay of removal pending the adjudication of an application for a provisional unlawful presence waiver, permitting removal in such circumstances would "strip" the alien of a "right to engage in an immigration process made available" by Congress and the implementing regulations. *Calderon*, 330 F. Supp. 3d at 958.

> Both the APA and the Fifth Amendment of the U.S. Constitution protect persons from an arbitrary governmental interference with the persons' rights and liberty. When a government agency makes available an immigration process to a class of persons but then deprive[s] a member of the class a fair opportunity to engage in the process, with no explanation or justification, that is an arbitrary governmental interference.

*Id.* at 956. The Court similarly holds that Petitioner's removal at this time, without affording her the opportunity to engage in the immigration process that should have been made available to her six years ago, would be arbitrary, capricious, contrary to law, and a violation of due process.

## B. Irreparable Harm

In assessing whether Petitioner is likely to experience irreparable harm absent a stay of removal, the Court heeds the Supreme Court's admonition that

removal cannot, standing alone, "constitute the requisite irreparable injury." *Nken*, 556 U.S. at 435. While removal will always impose a "serious burden," it is not an irreparable injury if the alien "may continue to pursue" their applications for relief following their removal, or where a court can, after concluding that an alien prevails on the merits, "[afford] effective relief by facilitation of their return, along with restoration of the immigration status they had upon removal." *Id.*

In contrast, courts routinely find that the irreparable harm requirement has been met if removal would foreclose the alien from obtaining immigration status or benefit. *See, e.g.*, *D'Ambrosio*, 2025 WL 1594312, at *3 (permanent loss of opportunity to obtain lawful permanent resident status in the United States constitutes irreparable harm); *S.N.C. v. Sessions*, 325 F. Supp. 3d 401, 412 (S.D.N.Y. 2018) (holding that irreparable injury requirement is met where removal would render alien ineligible for nonimmigrant visa); *You*, 321 F. Supp. 3d at 469 ("Unlike in cases where a removed alien may continue to pursue a petition for review from afar, Petitioner's removal would close his application for adjustment of status and bar him from reapplying for a decade." (citations omitted)).

Here, Petitioner received a Notice to Appear, but did not attend her hearing because she departed the country before the hearing date. Opp. Br. at 2-3. The Warrant of Removal/Deportation issued to Petitioner on June 16, 2025, warned that Petitioner would be prohibited from returning to the United States for ten years from the date of her departure, pursuant to Section 212(a)(9) of the INA. *See* 8 U.S.C. § 1182(a)(9); Wilkins Reply Decl., Ex. E at 6. It thus appears to be

Respondents' position that Petitioner would be subject to a ten-year bar on reentry if she were to be removed from the United States.[5]

From a survey of the caselaw in this Circuit, it does not appear that the Second Circuit has directly addressed whether the ten-year departure bar applies to individuals who have left the country before a removal order was entered but after removal proceedings began. The Fifth Circuit has held, however, in the analogous context of a departure bar contained in BIA regulations governing motions to reopen, that the regulatory departure bar does apply to aliens who left the United States after removal proceedings are initiated but before a final order of removal has been entered. *Toora v. Holder,* 603 F.3d 282, 286-88 (5th Cir. 2010).

As it is probable that Petitioner's removal would subject her to a bar on reentry, similar to the petitioner in *You*, the irreparable harm element has been met. *You*, 321 F. Supp. 3d at 468. Respondents argue that Petitioner can still pursue the U Visa she is in the process of obtaining even if she is removed, Opp. Br. at 11-12, and while that may be true, it does not negate the fact that a departure bar could render the relief provided by the U Visa moot due to Petitioner's inability to return to this country for ten years.

Petitioner also claims that she fears for her physical safety were she to return to Honduras. Plaintiff alleges that, while living in Honduras, she was threatened

---

[5] When asked at the TRO Hearing about the repercussions of Petitioner's potential removal on her avenues of relief, Respondents stated that they "[didn't] know the full scope of the applicability of the departure bar here" but admitted that it was not an "impossibility" that it would apply in her circumstances. Hr'g Tr. at 21:10-12.

by gang members from MS-13, who wanted her to pay them a "war tax." Habeas

Pet., ¶ 37. She alleges that, when she refused, they threatened her and her family

members. *Id.* One night, a gang member allegedly shot at her, killing a bystander,

prompting her departure for the United States. *Id.* ¶ 38. The Court weighs the

potential risk to Petitioner's physical safety as an additional factor in favor of the

grant of injunctive relief. *See Devitri v. Cronen*, 289 F. Supp. 3d 287, 296 (D. Mass.

2018). The Court does not have sufficient evidence before it to assess how probable

the risk of harm to Petitioner would be were she to be returned to Honduras,

including whether she remains a potential target of gang violence. *Leiva-Perez v.

Holder*, 640 F.3d 962, 969 (9th Cir. 2011) ("In asylum, withholding of removal and

CAT cases, the claim on the merits is that the individual is in physical danger if

returned to his or her home country. Consideration of the likelihood of such

treatment, determined apart from merits issues such as whether any physical abuse

would be on account of a protected ground for asylum and withholding purposes, or

whether the alien is barred from relief as a criminal alien, should be part of the

irreparable harm inquiry."). The proper forum for assessing the strength of these

claims in the first instance is the immigration court or an asylum officer. *See* 8

C.F.R. §§ 208.1 *et seq.* Yet Petitioner's removal before she could present her claims

for humanitarian relief through the appropriate channels provided for under the

immigration law would constitute irreparable harm, in that she would be

permanently denied the process to which she is entitled by this country's laws and

the Constitution. *Cf. D'Ambrosio*, 2025 WL 1504312, at *5 (staying removal of

petitioner so that he could have USCIS adjudicate his petition, even if the "adjudication may ultimately be unfavorable").

### C. Public Interest and Harm to Respondents

In considering the public interest and harm to the opposing party, "courts must be mindful that the Government's role as the respondent in every removal proceeding does not make the public interest in each individual one negligible." *Nken*, 556 U.S. at 435. In any application for a stay of removal, there will be a "public interest in preventing aliens from being wrongfully removed," and "a public interest in prompt execution of removal orders." *Id.* at 436. Courts must therefore determine on an individualized basis whether considerations specific to that case tip the balance in favor of one side or the other. For example, there may be a heightened public interest in preventing wrongful removal where there is a potential threat to the applicant's safety if removed to their home country. *Id.* On the other hand, the Government may have a heightened interest in the execution of the immigration laws if an applicant poses a danger to the community or has abused the immigration process. *Id.*

The Government has presented no evidence to this Court of Petitioner being a threat to the community or engaging in abuses of the immigration process. Indeed, Petitioner has been under an OSUP since at least 2019. TRO Mem. at 2 ("[T]he fact that the Government granted [Petitioner] supervised release five years ago necessarily means that it made the determination that she was neither a flight risk nor a danger to the community, and nothing has materially changed since then."). Petitioner has attended all of her ICE check-ins and even worn a

33

monitoring bracelet.  *Id.*  In contrast, Petitioner's removal could subject Petitioner

"to violence or possible death by her husband or the gangs she sought to escape."

Reply Br. at 10.

Although the Court acknowledges the Government's interest in the "prompt

execution of removal orders," Opp. Br. at 19, the Government cannot prioritize

speed over compliance with the law and the Constitution.  As such, the public

interest and the balance of equities weigh in favor of granting the stay of removal.

## CONCLUSION

For the reasons set forth in this opinion, the Court GRANTS Petitioner's

motion for a TRO.  Petitioner seeks an injunction through the pendency of the

Court's adjudication of this habeas petition.  Granting such relief in the expedited

context of an application for a temporary restraining order, where the record before

the Court was necessarily limited, is inappropriate.  The Court therefore enjoins

ICE from detaining Petitioner and stays Petitioner's removal from the United

States until **August 11, 2025.**

The Court will hold a hearing on Petitioner's application for a preliminary

injunction on **August 6, 2025, at 11:00 a.m.** in Courtroom 14C of the Patrick

Daniel Moynihan Courthouse, 500 Pearl Street, New York New York.  No later

than **July 28, 2025**, Respondents must show cause why the TRO should not be

converted to a preliminary injunction.  Petitioner may file a response no later

than **July 31, 2025.**

Additionally, by **July 17, 2025,** the parties shall submit a joint letter setting forth their respective positions as to whether the preliminary injunction hearing should be consolidated with a hearing on the merits of Petitioner's habeas petition.

SO ORDERED.

Dated:  July 10, 2025
      New York, New York

                          JEANNETTE A. VARGAS
                        United States District Judge